IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DISTRICT

**DIJON JONES**                                                                                                 **PLAINTIFF**

**VS.**                                             **CIVIL ACTION NO.** 3:25-cv-333-DPJ-ASH

**MANAGEMENT & TRAINING CORPORATION
AND JOHN AND JANE DOES 1-100**                                                **DEFENDANTS**

**COMPLAINT**

*Jury Trial Demanded*

1. This First Amended Complaint is brought by Dijon Jones (hereinafter collectively as "Plaintiff") by and through the undersigned counsel against Management and Training Corporation, and John and Jane Does 1-100. In support, therefore, Plaintiff states as follows:

**JURISDICTION AND VENUE**

2. This cause of action arises under the United States Constitution, as well as the Civil Rights Act, 42 U.S.C. § 1983. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, § 1332, and § 1343. The Court also has pendent jurisdiction over the Plaintiff's state causes of action.

3. Venue is appropriate pursuant to 28 U.S.C. § 1391(b) because the events complained of occurred in this judicial district and division.

**PARTIES**

4. Plaintiff Dijon Jones (hereinafter "Jones") is an adult resident citizen of Forrest County, Mississippi. However, at all times, material to this Complaint, he was a prisoner incarcerated at Wilkinson County Correctional Facility (hereinafter "WCCF") and East Mississippi Correctional Facility (hereinafter "EMCF"). Substantial acts,

omissions, and events that caused Plaintiff Jones's injuries occurred in Wilkinson County and Lauderdale County, Mississippi.

5. Defendant, Management and Training Corporation (hereinafter, "MTC"), a national for-profit prison operator incorporated existing in the state of Utah, was given a contract by the Mississippi Department of Corrections ("MDOC") in April, 2012 for the management and oversight of the prisons daily operations, which it has the responsibility for providing humane care and treatment consistent with all constitutional and ACA standards. MTC's 5,545-employee corrections division operates twenty-four (24) correctional facilities throughout the United States, with seventeen (17) contracts with state correctional departments and seven (7) with federal correction agencies. The acts, omissions, and events that gave rise to Plaintiff's complaint occurred under MTC's management. MTC principal place of business is located at 500 N Marketplace, Drive, Centerville, Utah 84014, and is subject to the personam jurisdiction of the Court by service of process upon is appointed registered agent, CT Corporation System, located at 645 Lakeland East Drive, Suite 101, Flowood, Mississippi 39232.

6. Plaintiff is ignorant about the identities of Defendant John and Jane Does 1-100 unknown officers, employees, agents, and or servants of MTC. Plaintiff will amend this Complaint to allege their true names and allege that each of the fictitiously named Doe Defendants are responsible in some manner for the occurrences herein alleged, and Jones's damages, as alleged herein, were proximately caused by their conduct. Upon information and belief, Plaintiff asserts that the Doe Defendants were the officers, agents, servants, and employees of Defendant and were at all times acting under color of law with the permission and consent of Defendant within the course and scope of their employment.

## FACTS

### *Gang Violence and Deliberate Indifference at EMCF and WCCF*

7. Defendant Management and Training Corporation ("MTC") is a private, for-profit corporation responsible for managing and operating correctional facilities across the United States. In Mississippi, MTC currently manages two facilities: East Mississippi Correctional Facility ("EMCF") located in Meridian, Mississippi, with a capacity of approximately 1,500 inmates, and Wilkinson County Correctional Facility ("WCCF") located in Woodville, Mississippi, with a capacity of approximately 900 inmates. MTC assumed management of EMCF in 2012. MTC assumed management of WCCF in July 2013.

8. MTC earns more than $525 million annually from its prison operations. Both EMCF and WCCF have long-standing, well-documented histories of gang violence, staff corruption, inadequate supervision, and inhumane living conditions.

9. For years prior to the attacks referenced in this complaint, MTC had actual knowledge that EMCF and WCCF were plagued by gang violence, drug trafficking, contraband, and assaults. Gangs control nearly every aspect of prison life, including where inmates sleep, eat, and access basic services, through violence and extortion. Inmates are forced to pay debts through food, labor, smuggling, or online cash equivalents such as Green Dot cards.

10. In a federal lawsuit, former EMCF Warden Frank Shaw testified that he could not guarantee the prison could perform its most basic function of keeping inmates safe. Surveillance video has shown officers taking as long as 30 minutes to respond to active assaults, during which inmates are left to bleed out in their cells or common areas.

11. MTC officials and staff have consistently ignored, tolerated, and in some cases participated in the corrupt environment that enables this violence. Employees have been known to

smuggle in weapons and contraband, receive payments from gang leaders, and allow favored inmates—especially those affiliated with gangs—special privileges such as unrestricted movement and cell access.

12. MTC frequently hires unqualified correctional officers who lack the training, judgment, and ethical standards necessary to safely supervise inmates. Many of these officers participate in or enable illegal activity, including smuggling drugs and weapons into the facility and maintaining sexual relationships with gang-affiliated inmates.

13. Gang members often identify and target young women without criminal records on social media platforms like Facebook, encouraging them to apply for officer positions at EMCF and WCCF. Once hired, these officers are groomed or manipulated into assisting gang operations by smuggling contraband, ignoring assaults, and granting gang members unauthorized access to housing units and rival inmates. This deliberate failure in hiring, screening, and supervising staff has created a culture of corruption and lawlessness that endangers all inmates and violates core standards of prison safety and constitutional care.

14. It is well documented that cell doors across EMCF and WCCF can be easily "rigged" or simply malfunction, allowing inmates to roam freely. This failure in physical security allows attackers to target vulnerable inmates, including those who report threats or attempt to disaffiliate from gang activity.

15. Numerous reports indicate that MTC staff at EMCF and WCCF, including supervisory officers, routinely engage in sexual and coercive relationships with gang members. These gang members then use those relationships to gain access to rival inmates, control contraband distribution, and avoid disciplinary actions.

16. In the case of Bobbie Jenkins and Steven Buckley, both were housed in EMCF in

November 2021 when they were brutally stabbed by Vice Lord gang members. Jenkins died of his wounds. Despite Buckley having reported concerns about gang favoritism by staff, no preventative action was taken. The attackers gained entry to the cells because the locks were inoperable, a common condition at the facility. (See *Buckley v. MTC*, Case No. 5:22-cv-26-DCB-FKB, S.D. Miss.).

17. Buckley and Jenkins were stabbed with free-world items, including a box cutter, ice pick, knife, and prison-made shanks. An officer was later arrested and charged for her involvement in this incident. Correctional officers laughed at them and delayed medical attention for nearly two hours. This pattern mirrors the mistreatment of Mr. Jones, reinforcing that the conditions at EMCF and WCCF are not isolated but systemic and ignored by MTC leadership.

18. Despite knowledge of weapons proliferation and gang movement, MTC conducted few if any targeted shakedowns, citing staffing shortages. Even when weapons were found, reports were ignored or altered. Employees were rarely disciplined, and prison policy against giving job duties to Security Threat Groups was regularly violated.

19. In *Jackson v. Wilkinson County*, Case No. 5:22-cv-00029-DCB-LGI, the plaintiff brought claims for failure to protect and constitutional violations stemming from similar inadequate staffing, gang activity, and deliberate indifference.

20. In *Russell v. MTC*, Case No. 3:22-cv-00294-HTW-LGI, Jeremy Russell was found dead in his EMCF cell in October 2021. The lawsuit alleged that MTC staff failed to prevent his suicide despite documented mental health risks and a history of self-harm, as well as MTC's role in fostering a facility culture rife with drug abuse and inadequate monitoring.

21. In *Marsh v. MTC*, Case No. 3:24-cv-00339-TSL-MTP, a plaintiff was brutally assaulted by gang members at EMCF due to MTC's failure to staff housing units, conduct proper

counts, and prevent known threats. The complaint outlined a systemic history of undertraining, understaffing, and employee complicity.

22. In *Carthan v. MTC*, Case No. 3:25-cv-00163-CWR-ASH, a wrongful death claim was brought on behalf of Edward Boyd, who was murdered by gang members in EMCF while staff ignored repeated security risks and allowed free movement due to broken cell locks and lack of supervision.

23. In *Rivers v. MTC*, Case No. 3:25-cv-156-CWR-LGI, the plaintiff was assaulted twice in late 2023 by Vice Lords after renouncing gang affiliation. The complaint emphasized MTC's deliberate indifference, including repeated staff failure to intervene, document assaults, or reclassify inmates with known threats.

24. MTC's practice of ignoring threats, permitting known violent gang members to work in sensitive positions, and failing to intervene before, during, or after violent incidents demonstrates a custom of deliberate indifference and failure to protect inmates like Jenkins, Buckley, Russell, Boyd, Rivers, and Mr. Jones.

### *MTC's Failure to Follow Security Procedures and Chronic Understaffing*

25. MTC, pursuant to its contract with the Mississippi Department of Corrections (MDOC), was required to implement policies and procedures for regular inmate counts, security rounds, and logbook documentation. These procedures—including certified counts at shift changes and hourly formal and informal counts—are critical to ensuring inmate safety. However, MTC staff routinely failed to perform these duties.

26. Officers failed to complete required rounds, document counts in logbooks, or submit count slips. This lack of accountability left zones unsupervised for extended periods and directly enabled gang assaults, such as those suffered by Mr. Jones.

27. As documented in *Carthan v. MTC,* Case No. 3:25-cv-00163-CWR-ASH (S.D. Miss.), MTC's longstanding failure to maintain adequate staff levels and ensure compliance with security policies created a foreseeable risk of harm. Internal audits and expert testimony revealed that officers skipped rounds, opened cell doors for gang-affiliated inmates, and ignored assaults caught on surveillance footage. These failures were not isolated. They reflect a systemic pattern of MTC operating facilities with dangerously low staffing levels, employing poorly trained and easily compromised guards, and failing to protect inmates from known threats—all of which amount to deliberate indifference under the Eighth and Fourteenth Amendments.

### *Brutal Assaults on Jones*

28. On June 5, 2022, while incarcerated at Wilkinson County Correctional Facility (WCCF), Plaintiff Jones was forcibly housed with a known violent, drug-addicted inmate. Mr. Jones made multiple verbal complaints to correctional staff regarding threats and aggressive behavior by his cellmate. Despite this, MTC officials failed to move Mr. Jones or conduct any risk assessment. That evening, his cellmate brutally stabbed him twice in the upper back using a prison-made shank. The assault lasted approximately 30 minutes. During that time, no correctional staff were present or responsive, despite screams from multiple inmates- illustrating a dangerous lack of supervision and understaffing.

29. Mr. Jones was transported to Merit Health Natchez, where he was diagnosed with a right-sided pneumothorax (collapsed lung) and two puncture wounds. He was admitted for trauma care and evaluated for chest tube placement. MTC failed to take disciplinary or protective action after the attack, and the assailant was never reclassified or red-tagged. This demonstrated a disregard for known safety risks and a failure to protect.

30. On March 19, 2024, while housed at East Mississippi Correctional Facility

(EMCF), Mr. Jones was ambushed by inmate Matthew Courtney, dragged into an unsecured cell, and beaten unconscious. At the time of the attack, no correctional officers were stationed in the zone or tower, despite the time being during scheduled meal movements. MTC's failure to assign staff and conduct proper counts during this vulnerable time facilitated the assault.

31.     Mr. Jones was transported to Anderson Regional Medical Center, where he was found to have a Glasgow Coma Score of 3, indicating deep unconsciousness and possible brain injury. He sustained a nasal bone fracture, head trauma, facial contusions, acute encephalopathy, and lactic acidosis, requiring prolonged intubation and intensive ICU care.

32.     These events occurred in the context of MTC's chronic failure to follow mandated security procedures. Like in *Carthan v. MTC*, Case No. 3:25-cv-00163-CWR-ASH, officers at EMCF and WCCF routinely failed to complete required security rounds, submit count slips, or document their observations in logbooks. These failures allowed inmates to roam zones freely and commit violent assaults without fear of intervention.

33.     On or about March 1 or 2, 2025, Mr. Jones was again assaulted in Unit 6 of EMCF by his new cellmate and other inmates. He was beaten, stripped naked, and sexually assaulted. Officer Moore—known for her romantic relationship with a gang-affiliated inmate—laughed at his pleas and refused to intervene. She and others later threatened Mr. Jones with delayed release if he reported the incident. No investigation was ever conducted.

34.     These repeated assaults were not coincidental. They occurred within an institutional culture where basic security protocols were ignored, zones were left unmonitored, and MTC tolerated staff participation in gang activity. MTC's failure to hire and train competent officers, coupled with deliberate understaffing and systemic disregard for safety protocols, created the exact environment in which Mr. Jones was attacked multiple times. These failures amount to deliberate

indifference under the Eighth and Fourteenth Amendments.

### *MTC Deliberately Ignored the Known Risk of Harm to Mr. Jones*

35. Despite repeated warnings, filed grievances, and known threats to his safety, MTC officials and employees deliberately ignored the substantial risk of harm to Plaintiff Jones. Mr. Jones explicitly notified staff that he feared for his life and requested protective action. MTC failed to respond, left him housed with dangerous inmates, and allowed known assailants to freely access his zone and cell. This disregard directly contributed to the multiple brutal assaults he endured.

36. MTC and its employees had subjective knowledge of the specific threats facing Mr. Jones. Nevertheless, they took no preventive action, failed to separate him from violent offenders, and neglected to reassess his classification or housing status. Their inaction—despite the foreseeability of harm—constitutes deliberate indifference under the Eighth and Fourteenth Amendments.

37. Weapons such as those used to stab Mr. Jones are readily available at EMCF and WCCF due to MTC's systemic failure to restrict contraband. Correctional officers frequently smuggle in weapons and drugs or turn a blind eye when gang-affiliated inmates possess or use such items. MTC has failed to implement or enforce policies that effectively curtail the availability of weapons, even though the threat is widely acknowledged by both staff and administrators.

38. MTC officials and staff at EMCF and WCCF are fully aware of the prevalence of weapons and gang violence. Yet guards are frequently bribed or intimidated into ignoring violations. Some are paid by gang members to look the other way, while others stay silent out of fear. MTC has taken no meaningful steps to reduce this pervasive culture of corruption, leaving inmates like Mr. Jones vulnerable to foreseeable and preventable harm.

39. Upon information and belief, MTC failed to conduct regular security shakedowns

at both facilities. When shakedowns were conducted, officers frequently ignored contraband or failed to report it—either because they were compromised or because MTC lacked adequate supervision and accountability. These failures contributed to the assaults on Mr. Jones, who suffered permanent and traumatic injuries as a result.

40. Upon information and belief, MTC failed to conduct regular security shakedowns at both facilities. When shakedowns were conducted, officers frequently ignored contraband or failed to report it—either because they were compromised or because MTC lacked adequate supervision and accountability. These failures contributed to the assaults on Mr. Jones, who suffered permanent and traumatic injuries as a result.

41. MTC was severely understaffed at the time of each assault. This pattern of chronic understaffing at both EMCF and WCCF left entire zones unsupervised and unmonitored, enabling gang members to carry out assaults with impunity. The few staff on duty were often undertrained and unsupervised, and therefore incapable of effectively managing inmate safety in a volatile environment. These conditions were negligent, grossly negligent, and deliberately indifferent to the risk of harm faced by Mr. Jones.

42. Both EMCF and WCCF are plagued by inmate-on-inmate violence, and MTC continues to operate these facilities without sufficient staff or supervision. Inmates are routinely left to fend for themselves in unsupervised units, and many correctional officers lack the training to respond to threats or prevent attacks. The assaults on Mr. Jones were not only foreseeable but inevitable given these conditions.

43. MTC has been repeatedly sued for similar conduct in both EMCF and WCCF. Cases such as *Buckley v. MTC, Rivers v. MTC*, *Marsh v. MTC,* J*ackson v. Wilkinson County*, and *Carthan v. MTC* highlight the persistent failures in security, staffing, and oversight that characterize both

facilities. These lawsuits, combined with internal incident reports, grievances, and audits, placed MTC's policymakers on clear notice of the violent and corrupt environments inside EMCF and WCCF. Nevertheless, MTC has refused to adopt or enforce policies necessary to reduce the danger—demonstrating a pattern of gross negligence, willful disregard, and deliberate indifference to the constitutional rights of inmates like Mr. Jones.

## COUNT 1:

### § 1983 CAUSE OF ACTION:
### UNCONSTITUTIONAL CONDITIONS OF CONFINEMENT, FAILURE TO TRAIN, SUPERVISE, STAFF AND DISCIPLINE

44. Plaintiff incorporates all preceding allegations.

45. MTC is treated as "municipality" for the purposes of complaints brought pursuant to 42 U.S.C. § 1983. MTC can be held liable for Jones's injuries if there exists a custom or policy that caused a constitutional deprivation attributed to MTC's policymakers.

46. MTC's policymakers and John and Jane Doe Defendants 1-100, have established customs, policies, and practices which created unconstitutional conditions of confinement, Defendants MTC and John and Jane Doe Defendants 1-100 violated clearly established constitutional rights of the decedent, including but not limited to:

   a. Cruel and unusual punishment under the Eighth and Fourteenth Amendments;

   b. Jones's right not to be deprived of liberty without due process of law;

   c. Jones's right to be safe and protected from injuries while in Defendants' custody;

   d. Jones's right to be protected by the prison officials and guards while under their control; and

   e. Jones's right to be free from excessive and unreasonable force.

47. As a direct and foreseeable result of Defendants' action, Jones suffered a brutal

attack, severe physical injuries, emotional distress, mental anguish, as well as pain and suffering.

48. Defendant MTC, by and through Doe Defendants 1-100 in their individual and official capacities, established customs, policies, and practices which directly and proximately caused the deprivation of Jones's constitutional rights as alleged herein. Defendant and the Doe Defendants were deliberately indifferent to the safety of Jones and other inmates at EMCF and WCCF. These policies created unconstitutional conditions of confinement.

49. Such unwritten policies, customs and practices include but are not limited to the following:

    a. Inadequate and improper training, supervision and discipline of EMCF and WCCF corrections officers;

    b. Inadequate and improper procedures and practices in screening hiring, training, supervising and disciplining officers who have improper relationships with inmates, specifically gang members and who routinely bring in contraband to those inmates creating a dangerous prison environment;

    c. In adequate and improper procedures, policies and practices for investigating improper activities by EMCF and WCCF correctional officer either through offender complaints of misconduct or through internally-initiated complaints or investigations;

    d. Inadequate or improper procedures, policies and practices for identifying and taking appropriate action against EMCF and WCCF correctional officers, who are in need of re- training, corrective measure, reassignment, other non-disciplinary actions, through a positive or early warning system designed to prevent such conduct;

  e. Failing to enforce policies and procedures with regards to the management and control of Security Threat Groups in violation of MDOC policy;

  f. Failing to staff EMCF and WCCF with trained and qualified guards adequately and allowing the prisons to be unstaffed, leading to an increase in inmate-on-inmate assaults and deaths;

  g. Housing gang members with inmates who have renounced their gang affiliation;

  h. Failing to follow policies and procedures to eliminate and/or control the flow of contraband, including but not limited to drugs and shanks, in the prison leading to an increase in inmate-on-inmate violence;

  i. Failing to enforce the policy of requiring guards to make security rounds to check on inmates which also leads to an increase of inmate-on-inmate violence.

50. All the actions by MTC, its policy makers, and Doe Defendants 1-100 were done with deliberate indifference to the constitutional rights of EMCF and WCCF inmates, specifically Jones, and caused and/or contributed to Jones's injuries.

### COUNT 2:

### § 1983 CAUSE OF ACTION
### RATIFICATION

51. Plaintiff incorporates all preceding allegations.

52. MTC, its policy makers, and Doe Defendants 1-100 were advised about the threats against Jones and his fear for his safety. MTC, by and through its policy makers, ignored evidence of widespread disregard of policies and procedures intended for the protection of inmates including Jones and systemic deficiencies that violated his constitutional rights. Based on information and belief, not one officer, supervisor, or any other person was disciplined, considered for discipline, or even retrained on policies intended to protect inmates. Instead, the policymakers approved the

actions of the correctional officers.

53. Through these acts and omissions of ratification, MTC's policymakers were deliberately indifferent to Jones's constitutional rights as set forth herein. A plaintiff can establish a municipal liability claim by showing that a final municipal policymaker approved an investigation that was "so inadequate as to constitute a ratification" of the misconduct. *Wright v. City of Canton*, 138 F.Supp.2d 955, 966 (N.D. Ohio 2001). "If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988). An isolated decision by a municipal official that is not intended to control future decisions can nonetheless give rise to municipal liability. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480-81 (1986). MTC ratified the actions of its employees; and is therefore liable for Jones's injuries.

## COUNT 3:

## NEGLIGENCE/GROSS NEGLIGENCE

54. Plaintiff incorporates all preceding allegations.

55. At all times, relevant herein, defendants and their employees had a duty to exercise ordinary care for the inmates at EMCF and WCCF, including Jones. Defenders and their employees breached that duty by failing to use the ordinary care that a reasonable person will use to avoid and prevent injury to others, i.e. in the case sub judice, to reasonably protect Jones from harm by other inmates. Defendants' breach of this duty led to the permanent damage sustained by the Plaintiff. This breach was so egregious as to amount to gross negligence.

56. The injuries sustained by Dijon Jones. were the reasonably foreseeable outcome of Defendants and their employees' acts and omissions. These acts and/or omissions were the substantial factors in causing injuries to Dijon Jones.

## COUNT 4:

### NEGLIGENT HIRING, TRAINING AND SUPERVISION

57. Plaintiff incorporates all preceding allegations.

58. Defendant MTC and John and Jane Doe Defendants 1-100 are required by law to provide sufficient training to prison administrators and correctional officers to protect inmates from harm, ensure their safekeeping, and ensure their well-being.

59. Acting under color of law and under the official policy, custom, and/or practice, Defendant, by and through their policy makers for MTC/EMCF and WCCF and John Doe Defendants 1-100, failed to hire, train and supervise correctional officers, administrators, and personnel sufficiently employed by MTC/EMCF and WCCF to provide for the safety adequate, and well-being of inmates, like Jones, while incarcerated at EMCF and WCCF to control and/or reduce inmate-on-inmate violence.

60. Defendant MTC and John Doe Defendants 1-100 failed to hire, train, and supervise its staff to handle the violent prison population that exists at EMCF and WCCF. As such, there have been numerous instances of violence against inmates, such as Jones, resulting in multiple inmate deaths and assaults.

61. Despite MTC's knowledge of the atmosphere of violence existing at MTC and the staff corruption that causes or contributes to the harm of inmates such as Jones, MTC's policymakers refuse to enforce policies and procedures to adequately train and supervise prison administrators and correctional officers to control and/or reduce inmate-on-inmate violence.

62. Thus, acting under the color of law and pursuant to official policy or custom, Defendant MTC and the John and Jane Doe Defendants 1-100 directly or indirectly approved,

acquiesced in, or otherwise participated in the acts or omissions which deprived Dijon Jones of his civil and constitutional rights.

63. Defendant MTC and the John and Jane Doe Defendants 1-100's failure to properly train prison correctional officers, administrators, and personnel at EMCF and WCCF resulted in the violation of Dijon Jones's civil and constitutional rights and caused him to suffer injuries.

## COUNT 5:

### RESPONDEAT SUPERIOR/VICARIOUS LIABILITY

64. Plaintiff incorporates all preceding allegations.

65. Defendants MTC and other unknown EMCF and WCCF correctional officers (Does 1-100) acted with negligence, gross negligence, and/or intentionally allowed or failed to prevent the attack on Jones. At all times relevant, each Defendant owed a duty to Plaintiff to ensure his safety, and the Defendants breached that duty. The actions and inactions of Defendant MTC and/or other EMCF and WCCF correctional officers led directly to the injuries suffered by the Plaintiff. Defendant MTC, as Defendant John and Jane Does 1-100's employer, is liable for their actions which were undertaken during the course and scope of their employment with Defendant MTC.

66. Defendant MTC is also responsible for the actions and/or inactions alleged herein against Defendants John and Jane Does 1-100 which caused the damages suffered by the Plaintiff. Such actions and/or inactions by said individual Defendants were committed within the course and scope of their employment with Defendant MTC.

## COUNT 6:

### PUNITIVE DAMAGES

67. Plaintiff incorporates all preceding allegations.

16

68. The Defendants have acted in complete disregard for the safety of the Plaintiff by acting in a grossly negligent manner as previously described herein. The actions of the Defendants warrant punitive damages.

69. The Defendants' actions exhibit gross negligence and direct disregard of the safety of the Plaintiff. Punitive damages should be awarded against the Defendants. Defendants' tortuous actions have caused bodily injuries, emotional distress, and mental anguish.

## **PRAYER FOR RELIEF**

70. Plaintiff Dijon Jones respectfully prays for the following relief:

   a. Actual and general compensatory damages of, from and against the Defendants, in amount to be determined by this Court;

   b. Punitive damages of, from and against the Defendants and John Doe Defendants 1-100, in an amount to be determined by this Court;

   c. Reasonable attorney's fees and all costs of this Court;

   d. Pre and post judgement interest; and

   e. Such other general and specific relief as appears reasonable and just in this cause.

RESPECTFULLY SUBMITTED, this 8th day of May, 2025.

**DIJON JONES**

By: /s/ LaToya T. Jeter
LATOYA T. JETER
*Attorney for Plaintiff*

OF COUNSEL:

LaToya T. Jeter (MSB NO. 102213)
BROWN BASS & JETER, PLLC
Post Office Box 22969 Jackson, Mississippi 39225
Telephone: (601) 487-8448
Facsimile: (601) 510-9934
Email: jeter@bbjlawyers.com